## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01293-MSK-KMT

BOLSA RESOURCES, INC., an Arizona corporation,

     Plaintiff,

     v.

MARTIN RESOURCES, INC., a Colorado corporation,
SALZBURG HOLDINGS, LLC, a Colorado limited liability company,
STEPHEN B. DOPPLER, a Colorado resident,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Kathleen M. Tafoya**

     This matter is before the Court on "Plaintiff, Bolsa Resources, Inc.'s Proposed Recommendations, Findings of Fact and Conclusions of Law Recommending Entry of Default Judgment Against Defendant Stephen B. Doppler and Salzburg Holdings, LLC." (Doc. No. 310 [Prop. Rec.], filed February 1, 2013.) Pursuant to 28 U.S.C. § 636(b)(1)(A) and D.C.COLO.LCivR 72.1(c), the motion is referred to this Court for recommendation. (Doc. No. 4.) Plaintiff seeks default judgment against Defendants Stephen B. Doppler and Salzburg Holdings, LLC (collectively, the "Doppler Defendants") as a sanction for the Doppler Defendants' wholesale abandonment of the case.

1

## I.     Procedural History

Plaintiff initiated this lawsuit on May 16, 2011, asserting fifteen claims for relief against thirteen Defendants.  (Doc. No. 1 [Compl.].)  On July 1, 2011, Plaintiff filed an "Amended Complaint and Jury Demand," reducing its number of claims to thirteen, against the same Defendants.  (Doc. No. 44 [Am. Compl.].)  The Amended Complaint sets forth an alleged scheme by which all of the Defendants conspired and colluded to deprive Bolsa of certain mining claims and real property ("Project Assets") relating to the Hill Copper Project ("Hill Copper Project") and the body of geologic data relating thereto ("Project Data").  *Id.*  Since filing its Amended Complaint, all Defendants except the Doppler Defendants have been dismissed from the action.  (Doc. Nos. 279, 281, 290 and 314.)

Originally the Doppler Defendants Answered the Complaint and even filed counterclaims.  (Doc. No. 48 [Answer] filed July 5, 2011.)  However, on September 20, 2012, this court granted the "Motion of T.J. Carney to Withdraw as Counsel of Record for the Doppler Defendants Stephen B. Doppler and Salzburg Holdings, L.L.C.," on the basis that Mr. Carney was not able to communicate with Mr. Doppler "due to his schedule, international travel for work, foreign location, and lines of communication."  (Doc. Nos. 282, 286.)  Mail sent to the Doppler Defendants from the court on September 27, 2012, October 4, 2012, and December 5, 2012 was returned undeliverable.  (Doc. Nos. 278, 288 and 297.)  On December 3, 2012, this court held a scheduling/status conference to address Plaintiff's request for leave to file a motion for partial summary judgment against the Doppler Defendants.  (Doc. No. 294.)  However, the Doppler Defendants did not appear at the conference, nor did counsel appear on their behalf.  *Id.*  Thereafter, this court issued an Order to Show Cause and scheduled a show cause hearing, ordering the Doppler Defendants to either appear in person or through counsel, and show cause why default judgment should not be rendered against them for failure to appear

at the December 3, 2012 scheduling and status conference.  (Doc. No. 295.) This document was re-mailed to Stephen Doppler at 576 S. Flower Street, Lakewood, CO  80226-2961, a forwarding address obtained by the court on one of the returned mail items.  (Doc. Nos. 298,299.)  This mailing was also returned as undeliverable.  (Doc. No. 304.)

The Doppler Defendants failed to appear at the December 20, 2012 show cause hearing either in person or through counsel.  (Doc. No. 305.)  Under Rule 37(b)(2)(A)(vi) of the Federal Rules of Civil Procedure, the court may issue sanctions, including "default judgment against the disobedient party" when a party disobeys a discovery order.  *Id*.; *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1159 (10th Cir. 2013).

Following the Doppler Defendants' failure to appear at any of the scheduled hearings or to provide contact information to the court, this court issued a Minute Order recommending entry of judgment against the Doppler Defendants upon Plaintiff's filing of Proposed Findings of Fact and Conclusions of Law setting forth evidence sufficient to support its claims.  (*Id.*)

Default judgment is a harsh sanction that will apply only if the failure to comply with court orders is the result of "'willfulness, bad faith, or [some] fault of petitioner' rather than inability to comply."  *M.E.N. Co. v. Control Fluidics, Inc*., 834 F.2d 869, 872 (10th Cir. 1987) (quoting *National Hockey League v. Metropolitan Hockey Club, Inc*., 427 U.S. 639, 640 (1976)). In addition, default judgment is appropriate only where lesser sanctions have been considered and found inappropriate.  *In re Rains*, 946 F.2d 731, 733-34 (10th Cir.1991.  This court finds that the Doppler Defendants' failure to comply with court orders was willful and in bad faith.  Mr. Doppler and his company, after answering and otherwise participating in the litigation, simply decided to "drop out."  They ceased all communication with their attorney and apparently moved from all addresses previously associated with

3

the individual and with the company.  There is simply no lesser sanction which is available to the court

to allow the Plaintiff its day in court.

## II.     Legal Standard

Default must enter against a party who fails to appear or otherwise defend a lawsuit. Fed. R. Civ.

.P. 55(a).  "[D]efault judgment must normally be viewed as available only when the adversary process

has been halted because of an essentially unresponsive party.  In that instance, the diligent party must be

protected lest he be faced with interminable delay and continued uncertainty as to his rights.  The default

judgment remedy serves as such a protection." *In re Rains*, 946 F.2d at 732–33 (internal quotation

marks and citation omitted)

"[A] party is not entitled to a default judgment as of right; rather the entry of a default judgment

is entrusted to the 'sound judicial discretion' of the court." *Greenwich Ins. Co. v. Daniel Law Firm,*

Civil Action No. 07-cv-02445-LTB-MJW, 2008 WL 793606, at *2 (D. Colo. Mar. 22, 2008) (internal

citation omitted).  Before granting a motion for default judgment, the Court must first ensure that it has

personal jurisdiction over the defaulting defendants and subject matter jurisdiction over the action.  *See*

*Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1202–03 (10th Cir. 1986).  Next, the Court should

consider whether the well-pleaded allegations of fact, which are deemed admitted by a defendant in

default, support a judgment on the claims against the defaulting defendants.  *See Fed. Fruit & Produce*

*Co. v. Red Tomato, Inc*., Civil Action No. 08-cv-01114-RPM-MEH, 2009 WL 765872, at *3 (D. Colo.

March 20, 2009) ("Even after entry of default, however, it remains for the court to consider whether the

unchallenged facts constitute a legitimate basis for the entry of a judgment.")  "In determining whether a

claim for relief has been established, the well-pleaded facts of the complaint are deemed true." *Id*. Cir.

1983)).  Likewise, undisputed facts set forth by the moving party in affidavits and exhibits are also

4

accepted as true. *Vibe Tech., LLC v. Suddath*, No. 06-cv-00812, 2009 WL 2055186, at *1 (D. Colo. July 10, 2009); *Deery American Corp. v. Artco Equipment Sales, Inc.*, Case No. 06-cv-01684-EWN-CBS, 2007 WL 437762 (D. Colo. Feb. 6, 2007).

Once the Court is satisfied that default judgment should be entered, it has the discretion to hold a hearing to determine the amount of damages. See Fed. R. Civ. Pro. 55(b)(2). Generally, a damages hearing is not needed when the damages requested are for a sum certain. *See United States v. Craighead*, 176 Fed. Appx. 922, 925 (10th Cir. 2006).

## III.   Background

This case has been litigated for a number of years before this court.  The following brief background is taken from Chief District Court Judge Marcia S. Krieger's December 20, 2011 order in *Bolsa Resources, Inc. v. AGC Resource, Inc.*, 2011 WL 6370409, *3 (D. Colo. Dec. 20, 2011):

> Bolsa is an Arizona corporation with its principal place of business in Ibiza, Spain; the company is primarily managed from Europe. Founded in 2005, Bolsa was created to develop and exploit mineral resources in the Turquoise Mining District of Cochise County, Arizona (the "Project"). As of 2009, Bolsa had acquired a number of patented and unpatented mining claims and surface interests in the area. In addition, it had conducted extensive geologic exploration and other research, resulting in data and materials related to the Project that included core samples, assays, drill logs, analytical results, cross-section maps, ore body assessments, and other geologic information.
>
> At the time of its founding in 2005, Bolsa was owed by an entity called Aurelio Resource Group. Bolsa's initial board of directors included Defendants Johnson, Doppler, and Warnaars. In 2009, Bolsa was acquired by Telifonda (Cayman) Ltd. ("Telifonda"). After the acquisition, Mr. Johnson, Mr. Doppler and Mr. Warnaars resigned from Bolsa's board of directors, leaving Frank Vermeulen as the sole director from February 2009 to April 2010.
>
> After resigning from Bolsa's board, Mr. Johnson, Mr. Doppler, and Mr. Warnaars continued to be associated with Bolsa. Mr. Johnson, a lawyer who had previously served as Bolsa's general counsel, entered into a contract with Bolsa to provide advice and legal services for a monthly fee. Mr. Warnaars and International American Resource, Inc. ("IAR"), a company of which he was the principal, entered into consulting agreements

with Bolsa to provide business services and advice. Similarly, Mr. Doppler and his associated company, Salzburg Holdings LLC ("Salzburg"), entered into consulting agreements with Bolsa. These agreements, entitled "Executive Consulting Agreements," contain comprehensive non-disclosure and non-competition provisions.

At the same time, Mr. Doppler, Mr. Johnson, and Mr. Warnaars were associated with another company called Martin Resources, Inc., ("MRI"), which appears to be unrelated to Bolsa. Mr. Johnson and Mr. Warnaars were officers and directors of MRI and Mr. Johnson served as MRI's legal counsel. Mr. Johnson, Mr. Doppler, Mr. Warnaars, and their associated entities (IAR, Salzburg, and MRI) are all citizens of Colorado and are hereinafter referred to collectively as the "Colorado Defendants."

Bolsa alleges that in February 2010, Mr. Johnson, while still in a confidential relationship with Bolsa, falsely advised Mr. Warnaars that Bolsa had been statutorily dissolved and that its assets were in foreclosure. Mr. Johnson then drafted deeds by which Mr. Warnaars, named in the documents as president of Bolsa, transferred a number of Bolsa's mining claims and other assets to Mr. Warnaars' entity, IAR. Purportedly, the Bolsa board approved the transactions as reflected in board minutes signed by Mr. Warnaars; however, at such time Mr. Warnaars was neither an officer nor director of Bolsa and no board meeting actually occurred. Indeed, these transactions were not known to Mr. Vermeulen, the only director of Bolsa's board at the time.

Once the claims were transferred to MRI, Mr. Johnson and MRI then began to market the Project and to solicit third-party investors, using some of the Project data to assist in the marketing effort. In June 2010, MRI entered into an agreement with Defendant Arizona–Alpaca Resource Corporation ("AARC"), a subsidiary of Alpaca, and Alpaca to jointly develop the Project; pursuant to this agreement, which was signed by Mr. Warnaars, MRI agreed to convey certain of the Project claims and information relating to those claims to AARC. Mr. Johnson became an officer at Alpaca in July 2010.

As part of the joint venture, a number of Alpaca subsidiaries were created as holding companies for the assets. MRI conveyed some of the Project assets to AGC Resources, Corp. ("AGC"), one of the Alpaca subsidiary holding companies. Other mining claims important to the Project were acquired by other Alpaca subsidiaries at foreclosure auctions, allegedly based upon confidential information and Project data supplied by the Colorado Defendants. At some time between June and October 2010, Mr. Johnson leased to, and then sold, a parcel of real property in Arizona (the "Elfrida Property") to AGC.

## IV.   Well-Pleaded Factual Allegations for Which Plaintiff Seeks Default Judgment

Plaintiff  filed its Proposed Recommendation containing in the first twenty-five pages, an

exhaustive factual summary of the evidence supporting Plaintiff's claim for default judgment.  In

addition to its own Amended Complaint and twenty exhibits attached thereto, the Plaintiff has attached twenty-six separate exhibits in support of its Proposed Recommendation.  These exhibits include deposition transcripts of  Stephen B. Doppler, Antony Warnaars, and Frederik W. Warnaars as well as various Rule 30(b)(6) depositions of companies.  The exhibits also include a number of other documents produced in discovery prior to the Doppler Defendants disappearance.  This court has reviewed the exhibits and the factual statements and finds them to be set forth appropriately.  Therefore, the court adopts Plaintiff's the factual presentation set forth more fully in the Proposed Recommendations together with all attachments thereto to the extent it sets forth the evidentiary support for default judgment and will not burden the record by repetitive regurgitation herein.

Further the Complaint is verified by Rene Sijmonsbergen, Director, President and CEO of Plaintiff, Bolsa.  Therefore, the court may treat it as an affidavit.  *Green v. Branson*, 108 F.3d 1296, 1301 n. 1 (10th Cir. 1997). *See also Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) ("Although a nonmoving party may not rely merely on the unsupported or conclusory allegations contained in his pleadings, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e)."). "Rule 56(e) requires that the affidavit be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein." *Conaway*, 853 F.2d at 792.  The court find that the verified complaint complies with this instruction and should therefore be treated as an affidavit.

## V.    ANALYSIS

Before proceeding with a default judgment, even one entered as a sanction pursuant to Fed. R. Civ. P. 37, the Court must consider whether it has jurisdiction, whether the facts establish a legitimate basis for the entry of judgment and whether the damages can be ascertained.

**A.     Jurisdiction**

In determining whether a default judgment is warranted, the Court must first consider whether it has jurisdiction over the subject matter and the defendant.  *Dennis Garber & Associates, Inc., v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 772 (10th Cir. 1997); *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1202-03 (10th Cir. 1986).  The Court must do so in consideration of the well-established rule that "a judgment is void if the court that enters it lacks jurisdiction over either the subject matter of the action or the parties to the action." *United States v. 51 Pieces of Real Prop.,* 17 F.3d 1306, 1309 (10th Cir. 1994).

**1.     Subject Matter Jurisdiction**

At the time this action was filed, Plaintiff was incorporated in Arizona and managed its business from Spain.  (Am. Compl. at 3.)  For purposes of subject matter jurisdiction, Plaintiff is a citizen of Arizona and Spain.  See 28 U.S.C. § 1332(c)(1) (a corporation shall be deemed to be a citizen of every State in which it has been incorporated and the State where it has its principal place of business).  Defendant Salzburg Holdings, LLC is a Colorado limited liability company with its principal place of business located at 29893 Paint Brush Drive, Evergreen, CO 80439,[1] and qualifies as a citizen of Colorado.  *Id.*; (Am. Compl. at 3; Answer [Doc. No. 48] at ¶ 1.)  Defendant Stephen B. Doppler is believed to maintain a permanent address in Colorado, and to be domiciled in Colorado.  (Answer at ¶1.)  Consequently, both Doppler Defendants are citizens of Colorado.  Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction because the amount in controversy exceeds $75,000, and the action is between citizens of different states.  28 U.S.C. § 1332 (a)(1); (Am.Compl. ¶2.)

---

[1] Although as noted mail sent to this address subsequent to the withdrawal of Salzburg's attorney has been returned as undeliverable.

8

### 2.      Personal Jurisdiction

In addition to subject matter jurisdiction, entry of default judgment in a civil case requires personal jurisdiction over Defendants. *Bixler v. Foster*, 596 F.3d 751, 761 10th Cir. 2010). Plaintiff bears the burden of establishing personal jurisdiction over Defendants. *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000). "[P]laintiff need only make a *prima facie* showing [of personal jurisdiction] if the motion [for default judgment] is decided only on the basis of the parties' affidavits and other written materials." *Dennis Garberg & Associates, Inc.*, 115 F.3d at 773.

The Court addresses first the adequacy of service. *See United States v. Elsberg*, No. 08-cv-00522-MSK-KLM, 2010 WL 5177439, at *2 (D. Colo. Aug. 17, 2010). The Doppler Defendants waived service of the summons for this suit, pursuant to Fed. R. of Civ. P. 4. (Doc. No. 37.) Further they filed an Answer and Counterclaims in the case which did not raise any issue with respect to service. (Doc. No. 48.) As such, the Court finds that the Doppler Defendants were properly served in compliance with Fed. R. of Civ. P. 4 and have submitted to the jurisdiction of the court.

As noted above, Plaintiff asserts and the Doppler Defendants admit that Stephen Doppler is a citizen of Colorado and that Salzburg Holdings, LLC, is a Colorado limited liability company. (Am. Compl. at ¶¶ 8, 10; Answer at ¶1.) This court therefore finds that it has personal jurisdiction over the Doppler Defendants.

### B.      Plaintiff's Claims

The claims pending against the Doppler Defendants include[2]: Claim I – breach of contract; Claim II – breach of the duty of good faith and fair dealing; Claim IV – nondisclosures; Claim V –

---

[2] Inapplicable Claims: Claim III alleges breach of fiduciary duty by Defendant David Stafford Johnson, and Claim VII alleges professional negligence against Defendant Johnson.

tortious interference with contract; Claim VI – tortious interference with business advantage; Claim VIII – unjust enrichment; Claim IX – conversion; Claim X – recovery of stolen property; Claim XI – theft/destruction of trade secrets; Claim XII – civil conspiracy; Claim XIII – violations of the COCCA; and Claim XIV – injunctive relief.

**Claim I          Breach of Contract**

In order to establish a breach of contract claim against the Doppler Defendants, Plaintiff must show: (1) the existence of a contract between Plaintiff and the Doppler Defendants; (2) performance by Plaintiff; (3) the Doppler Defendants breached the contract; and (4) Plaintiff was damaged by the Doppler Defendants' breach. *See Echostar Satellite L.L.C. v. Channel One TV, Inc.*, Case No. 05-cv-00467-WYD-PAC, 2007 WL 8833, at *1 (D. Colo. Jan. 2, 2007); *Beal Bank Nevada v. Kettell,* Case No. 08-cv-02387-MSK-BNB, 2010 WL 551396, at *2 (D. Colo. Feb. 12, 2010).  The interpretation of a written contract is a question of law for the court to decide.  *B & B Livery, Inc. v. Riehl,* 960 P.2d 134, 136 (Colo.1998).

On or about March 1, 2009 Plaintiff and the Doppler Defendants entered into a contractual arrangement by virtue of the Executive Consulting Agreement ("Agreement").  (Am. Compl., Ex. K at 8; Prop. Rec., Ex. B.)  Under this agreement Plaintiff was required to provide the Doppler Defendants access to all necessary information controlled by Plaintiff in order to make it possible for the Doppler Defendants to provide effective consultation.  Plaintiff was also required to reimburse any reasonable expenses incurred by the Doppler Defendants and pay sixty dollars per hour for any appropriate and documented consulting services Mr. Doppler rendered.  This contractual arrangement provides the first element of Plaintiff's breach of contract claim—

the existence of a contract with the Doppler Defendants. *Echostar Satellite L.L.C. v. Channel One TV, Inc.*, 2007 WL 8833, at *1.

Though the Doppler Defendants did not challenge the validity of the Agreement, prior to their vanishing act in this case, they argued that Plaintiff failed to perform its duties by omitting to pay the Doppler Defendants $7,710 owed for consulting services.  (Doc. No. 48 at 9.)  There is no dispute that the Plaintiff performed under the contract by providing the necessary information to the Doppler Defendants.   The Doppler Defendants have abandoned their defense of the case and have failed to advance the non-performance theory against the Plaintiff and therefore this court will not grant it credence.  Additionally, this court finds that the Doppler Defendants released their legal claims to the deficient payments when they entered in the Debt Relief Agreement with Plaintiff.  (Prop. Rec., Ex. D.)

The Doppler Defendants terminated their contractual relationship with Plaintiff on March 31, 2010.  (*See* Am. Compl., ¶ 58; *see also* Prop. Rec., Ex. A.2 at 47/8-12; Ex. C.)  Plaintiff has alleged that the Doppler Defendants breached their duty of confidentiality under the Agreement. (*See* Am. Compl., ¶ 95.)  Under the terms of the Agreement, the Doppler Defendants were barred from disclosing Plaintiff's confidential business information to third parties until March 31, 2012—two years from the date of its termination.  (*See* Am. Compl., Ex. K; *see also* Prop. Rec., Ex. A.1 at 55/20-56/7; 208/17-22; Ex. B at 3.)

There is no evidence that Plaintiff provided the Doppler Defendants with written consent to share its confidential information.  (*See* Am. Compl. ¶¶ 97-101.)  The Plaintiff has provided evidentiary support that the Doppler Defendants breached Section 10(a) of the Agreement by: (a) sending Alpaca eleven disks on June 1, 2010 containing information relating to Plaintiff's

11

business, properties and financial affairs (Prop. Rec., Ex. P); (b) sending information regarding

Plaintiff's outstanding loans and creditors to Alpaca on June 21, 2010 (Prop. Rec. ¶ 88, Ex. T);

(c) sending a 60GB hard drive of Plaintiff's geological and financial information to Alpaca

(Prop. Rec. ¶ 86; Ex. A.2 at 476:9-25, 478:17-479:5; Ex. E; Ex. S); (d) giving Alpaca copies of

the files and information stored in Plaintiff's Colorado office (Prop. Rec., Section 6, ¶¶ 81-90

and attached documents); (e) providing confidential information to Alpaca's investors and

potential investors – both information relating to the Hill Copper Project and to Plaintiff's

business and finances (*id*.); and (f) contracting with Alpaca to provide Alpaca the same services

that they had provided to Plaintiff over the previous five years, services which required the

Doppler Defendants to share Plaintiff's confidential and proprietary information with Alpaca

(Prop. Rec. ¶ 67, Ex. J), all as set forth in the evidentiary summary of the Proposed

Recommendation.

 The court finds the plaintiff has met its burden as to the third element of its breach of

contract claim – a breach by the Doppler Defendants.

 Finally, though Plaintiff retained its ability to access some Project Data during the relevant

period, the Doppler Defendants denied Plaintiff the competitive benefit of <u>exclusive</u> control of the

Project Data.  (Prop. Rec., Ex. B at 3.)  Furthermore, the Doppler Defendants' efforts to assist Alpaca in

gathering information about the Hill Copper Project resulted in Plaintiff's loss of record title to the Man

Claims, Gold Coin No. 55 and two of the Courtland Townsites.  (*See* Am. Compl., Ex. E.)

Consequently, Plaintiff has been forced to file suit in Arizona to quiet title as to those properties and

incurred significant legal fees as a result.

In a breach of contract action, "the objective is to place the injured party in the same position it would have been in but for the breach." *Leprino Foods Co. v. Factory Mut. Ins. Co.,* 653 F.3d 1121, 1134 (10th Cir. 2011) (quoting *Protectors Ins. Serv., Inc. v. U.S. Fidelity. & Guar. Co.,* 132 F.3d 612, 615 (10th Cir. 1998)).

The Plaintiff seeks the value of the Project Data as its actual damages resulting from the Doppler Defendants' breach of contract. The Plaintiff has submitted a Market Value Appraisal of the Interests Held by Bolsa Resources in the Hill Copper Property Turquoise Mining District, Arizona dated April 23, 2012 ("Appraisal) (Prop. Rec., Ex. G) as evidence of the value of the Project Data which was wrongfully disseminated. In light of this comprehensive value analysis, this court concludes that Plaintiff has established, with reasonable certainty, that the value of exclusive possession and use of the Project Data is $11 million, as set forth in the Appraisal.

Because the parties' Agreement does not provide for an award of attorneys' fees or costs to the prevailing party, no attorneys' fees or costs are awarded in conjunction with Plaintiff's claim for breach of the contract.

The court concludes that the Plaintiff has presented well-pleaded facts which support each element of the claim of breach of contract and that default judgment on the claim is appropriate.

### Claim II        Breach of the Covenant of Good Faith and Fair Dealing

Colorado recognizes that every contract contains an implied duty of good faith and fair dealing. *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995). The duty of good faith and fair dealing applies when the manner of performance under a specific contract term allows for discretion on the part of either party. *Id.* The "concept of discretion in performance 'refers to one party's power after contract formation to set or control the terms of performance.'" *Id.* (internal citations omitted). As addressed

previously by Chief District Court Judge Marcia S. Krieger in this case, "[t]he good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations. It applies when one party "has discretionary authority to determine certain terms of the contract, such as quantity, price, or time" but does not override express terms and conditions. *Bolsa Resources*, 2011 WL 6370409, at *3 (citing *Amoco Oil,* 908 P.2d at 498).

The Agreement provided the Doppler Defendants discretion in their performance, subject only to the "general control and direction of the Board of Directors." (See Am. Compl. Ex. K; Prop. Rec., Ex. B at 2.) The Agreement states that Stephen Doppler would "exercise his powers and discharge his duties honestly, in good faith and in the best interest of [Plaintiff] and . . . exercise the degree of care, diligence, and skill that a reasonably prudent person would exercise in the promotion of the best interest of [Plaintiff]." (*Id.*)

Defendant Stephen Doppler, individually and through Salzburg Holdings, LLC, developed a business relationship with one of Plaintiff's competitors and assisted in conveying Plaintiff's Project Assets away from the company without authorization as set forth herein. His failure to report to Plaintiff the transfer of Project Assets to Alpaca in February 2009 (Am. Compl., ¶¶ 41, 64, 66 and 67; Prop. Rec., Ex. A.1 at 69/15-71/14), as well as his creation of MRI, in concert with Mr. Warnaars, only two months later (Am. Compl., Ex. G), demonstrate that the Doppler Defendants failed to honestly promote the best interests of Plaintiff. Consequently, the court finds that the Doppler Defendants breached their duty of good faith and fair dealing.

The court concludes that the Plaintiff has presented well-pleaded facts which support each element of the claim of breach of the covenant of good faith and fair dealing and that default judgment

on the claim is appropriate.  The damages, however, for the breach of the duty of good faith and fair

dealing claim is the same as for the breach of contract.

<b>Claim IV        Nondisclosure or Concealment</b>

To establish a claim for nondisclosure or concealment Plaintiff must show: (1) the Doppler

Defendants failed to disclose a past or present material fact that they had a duty to disclose; (2) with an

intent to induce Plaintiff to take a course of action he or she would not otherwise have taken; and (3) that

Plaintiff justifiably relied on the omission, causing damages to Plaintiff.  *See Central Masonry Corp. v.*

*Bechtel Nat., Inc.,* 857 F. Supp.2d 1160, 1163-64 (D. Colo. 2012) (citing *Wisehart v. Zions*

*Bancorporation,* 49 P.3d 1200, 1204 (Colo. App. 2002).

Plaintiff asserts that the Doppler Defendants owed a duty to disclose: (1) the transfer of Project

Assets away from Plaintiff; (2) the Doppler Defendants' provision of the Project Data to third parties,

and (3) the fact that third parties were actively seeking to consolidate Project Assets and the Project

Data.  (Prop. Rec. ¶ 36.)  Plaintiff argues that the Doppler Defendants' duty to disclose these facts arises

out of Mr. Doppler's "longstanding relationship" with Plaintiff as a former President until February 18,

2009 and thereafter as an executive consultant for Plaintiff.  (Prop. Rec. ¶ 41; Am. Compl. ¶ 56.)

However, Plaintiff offers no authority for the proposition that a former president or employee of a

company owes his former company a duty of disclosure.  (*See id.*)  While a former employee may be

contractually obligated to *avoid* disclosing confidential information relating to his former employer,

there is no precedent for imposing a duty of *disclosure* on an employee to its former employer. *See*

*Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1193-1194 (Colo. App.  2009) (recognizing a duty to

honor confidentiality of former employer).  As such, Plaintiff's allegation that the Doppler Defendants

owed a duty to disclose their provision of Project Data to Alpaca is not persuasive.

15

Therefore, this court recommends that default judgment be denied on Claim IV, non-disclosure/concealment.

### Claim V      Tortious Interference with Contract

To establish a claim for tortious interference with contract, Plaintiff must show: (1) it had either a valid existing contract with a third party or that it expected to enter into a contract with a third party; (2) Defendants induced or otherwise caused the third party to breach the contract or not enter into the contractual relation; (3) Defendants did so intentionally; and (4) Defendants used improper means. *Tara Woods Ltd. Partnership v. Fannie Mae,* 731 F.Supp.2d 1103, 1119 (D. Colo. 2010) (citing *Harris Group, Inc. v. Robinson* 209 P.3d 1188, 1195-96 (Colo.App.2009)).

The tortious interference outlined in Plaintiff's Amended Complaint focuses on the interference of all original Defendants with Plaintiff's contractual rights to real property holdings, mining claims, and options to purchase surface rights overlying mineral interests relevant to the Project.  (*See* Am. Compl., ¶¶ 115-121.)  Because the Doppler Defendants are the only remaining Defendants, Plaintiff has shifted the focus of its tortious interference with contract claim to the Doppler Defendants' interference with Plaintiff's contractual relationships with Earl Detra ("Detra"), Bolsa's former Vice President of Exploration and later an independent contractor providing consulting services to Plaintiff (Prop. Rec., Ex. K at 15), and Gerald Applebee, an individual working with Mr. Detra as a consultant and under contract to Bolsa. (Prop. Rec. ¶ 37, 73).

Plaintiff asserts Doppler encouraged Mr. Detra and Mr. Applebee to develop professional relationships with Alpaca which eventually resulted in both men ending their contracts with

Plaintiff and transferring their loyalties and their skills to Alpaca.  (*See* Prop. Rec., Ex. A.1 at 33/11-37/24; Ex. A.1 at 32/2-6; Ex. M at 2/22-25; Ex. O.)  (*see also* Prop. Rec., Ex. A.2 at 257/11-261/24; Ex. N, Alpaca's Answer to Interrogatory No. 3, pp.15-18.)  At the time the Doppler Defendant encouraged the defection of Mr. Detra to Alpaca, Bolsa had an executive consulting agreement with Detra that had not been terminated.  (Prop. Rec, Ex. A.2 at 244/2-6; Ex.M, Vol .I at 41/22-25; Ex. E; Ex. O.)  There is no contract attached between Applebee, who is not mentioned or named in the Amended Complaint, to the Proposed Recommendations, however.  Therefore, the court finds the Plaintiff has brought forth evidence of intentional interference with the contract between Bolsa and Detra only.

It is not enough, however that the Plaintiff show intentional interference.  In order to be tortious, the interference must also be by improper means.  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995).  Section 767, comment c, of the Restatement (Second) of Torts provides examples of what sort of action would qualify as improper. [3]  Threats of physical violence or law suits, economic pressure, and misrepresentations qualify as improper inducements to breach contractual or business relationships.  Restatement (Second) of Torts § 767 cmt c (1979).

Approximately one month subsequent to Mr. Detra's change in loyalty from Bolsa to Alpaca, Alpaca began issuing 1,375,000 shares of stock to the Doppler Defendants.  (Prop. Rec., Ex. A.1 at 172:24-173:3; Ex. N, Answer to Interrogatory No. 8, p.23).  An allegation that the Doppler Defendants' encouraged individuals to transfer their allegiance from Plaintiff to Alpaca, however, is not improper in itself, even if done for the Doppler Defendants' self-interest. *See*

---

[3] Colorado has adopted the Restatement (Second) of Tort's definition of tortious interference with contract.

*Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1123 (10th Cir. 2008) (competitive self-interest is not, by itself, improper); *Amoco Oil Co. v. Ervin*, 908 P.2d at 502 (Colo. 1995) (an actor may use persuasion without engaging in wrongful means) (citing Restatement (Second) of Torts cmt e (1979)).

Plaintiff, therefore has not pleaded facts which support the element of improper means so as to satisfactorily prove a claim of tortious interference with contract.  Accordingly, this court recommends that default judgment be denied as to that Claim V.

### Claim VI        Tortious Interference with Business Relations

In order to be liable for tortious interference with business relations, the Plaintiff must show that the Doppler Defendants acted intentionally and improperly to induce one or more of Plaintiff's business relations to not enter or continue business relations with Plaintiff.  *Amoco Oil Co. v. Ervin,* 908 P.2d at 500 (citing Restatement (Second) of Torts, § 766B (1979)).  Plaintiff argues that the Doppler Defendants intentionally interfered with Plaintiff's prospective business advantages, including joint ventures or other partnerships relating to the Hill Copper Project, by divesting Plaintiff of the Project Data and assisting in the transfer of Plaintiff's Project Assets away from Plaintiff.  (Prop. Rec. ¶¶ 37-38.)

Plaintiff's allegations outline a course of action by the Doppler Defendants that was clearly intentional.  (*See* Am. Compl., ¶ 73; *see also* Prop. Rec., Ex. H, Vol. I at 84/14-85/12 and 134/19-135/21.)  Specifically, Plaintiff asserts that Mr. Doppler, while stilled employed by Plaintiff, was aware that Mr. Warnaars had executed quit claim deeds and transferred Project Assets from Bolsa to Alpaca without the knowledge of Plaintiff's sole director, Frank Vermeulen.  (Am. Compl., ¶¶ 41, 64, 66, 67; Prop. Rec., Ex. A Vol. I at 7/15-9/14.)  Defendant Doppler neither notified Mr. Vermeulen nor

attempted to prevent the transfer.  (*See* Prop. Rec., Ex. A, Vol.1 47/21-48/1, 69/7-71/14.)  Furthermore, when Plaintiff asked for return of Project Data months later, Mr. Doppler did not respond to Plaintiff, instead notified Plaintiff's competitor of Plaintiff's efforts recover its Project Data.  (*See* Prop. Rec., Ex. T.)  Plaintiff asserts that the Doppler Defendants intentionally failed to disclose this information in order to prevent Plaintiff from undertaking an effort to clarify its right to title of the Project Assets and Project Data.

In addition to the specific allegations connected to the other Claims addressed in this Recommendation *supra*,[4] there is evidence that the Doppler Defendants created a joint venture, along with Mr. Warnaars, explicitly designed to market Plaintiff's Project Assets.  (Am. Compl. ¶ 68, 72-74.)  As a result of the Doppler Defendants' actions, Plaintiff lost a legitimate business opportunity and received no compensation for its Project Assets.

The court concludes that the Plaintiff has presented well-pleaded facts which support each element of the claim of tortious interference with business relations and that default judgment on the claim is appropriate.

_____

[4] Including that Defendants breached Section 10(a) of the Agreement by: (a) sending Alpaca eleven disks on June 1, 2010 containing information relating to Plaintiff's business, properties and financial affairs (Prop. Rec., Ex. P); (b) sending information regarding Plaintiff's outstanding loans and creditors to Alpaca on June 21, 2010 (Prop. Rec. ¶ 88, Ex. T); (c)sending a 60GB hard drive of Plaintiff's geological and financial information to Alpaca (Prop. Rec. ¶ 86; Ex. A, Vol. II at 476/9-25, 478/17-479/5, Ex. E; Ex**.** S); (d) giving Alpaca copies of the files and information stored in Plaintiff's Colorado office (Prop. Rec., Section 6, ¶¶ 81-90 and attached documents; (e) providing confidential information to Alpaca's investors and potential investors – both information relating to the Hill Copper Project and to Plaintiff's business and finances (*id.*); and (f) contracting with Alpaca to provide Alpaca the same services that they had provided to Plaintiff over the previous five years, services which required the Doppler Defendants to share Plaintiff's confidential and proprietary information with Alpaca (Prop. Rec. ¶ 67, Ex. J.), all as set forth in the evidentiary summary of the Proposed Recommendation.

In Colorado, the measure of damages for tortious conduct is as set forth in the

Restatement (Second) of Torts § 774A(1) is :

> (a) the pecuniary loss of the benefits of the contract or the prospective
>     relation;
> (b) consequential losses for which the interference is a legal cause; and
> (c) emotional distress or actual harm to reputation, if they are reasonably
>     to be expected to result from the interference.

*See Westfield Development Co. v. Rifle Inv. Associates,* 786 P.2d 1112, 1120 (Colo. 1990) (citing

the Restatement (Second) of Torts § 774A(1)).  Generally, damages for tortious interference do

not include attorneys' fees.  *See Swartz v. Bianco Family Trust,* 874 P.2d 430 (Colo. App. 1993);

*Tax Services of America, Inc. v. Mitchell,* Case No. 07-cv-00249-REB-KLM, 2009 WL 464679,

at *5 (D. Colo. Jan.13, 2009).  This court finds that an appropriate measure of actual damages

includes the value of the Project Data, valued at $11 million pursuant to the Appraisal.

### Claim VIII     Unjust Enrichment

A claim for unjust enrichment requires that Plaintiff show: (1) a benefit was conferred on

Defendants at the expense of Plaintiff; (2) the benefit was appreciated by Defendants; and (3) the

benefit was accepted by Defendants under such circumstances that retaining the benefit without

paying its value would be inequitable.  *Lewis v. Lewis,* 189 P.3d 1134, 1141 (Colo.

2008);*Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n*, 649 P.2d 1093 (Colo.

1982).  "The claim of unjust enrichment is a judicially-created remedy designed to undo the

benefit to one party that comes at the unfair detriment of another.  Unjust enrichment is based on

principles commonly associated with restitution."  *Id.*  "Unjust enrichment may be appropriate

when '[t]he defendant's wrongful act may be a common-law tort, such as conversion of personal

property or trespass to land, or it may be an equitable wrong such as breach of trust or other

fiduciary obligation.' " *Harris Group, Inc. v. Robinson,* 209 P.3d 1188, 1205 (Colo. App. 2009) (citations omitted).

Plaintiff has alleged that the Doppler Defendants received 1,375,000 shares of Alpaca's common stock and cash payments of $27,773.31 from Alpaca in exchange for assisting Alpaca in acquiring Plaintiff's assets, including the Project Assets and Project Data. (*See* Prop. Rec., Ex. N at 17-18, 23.) However, because unjust enrichment is an equitable remedy, it is inapplicable if Bolsa has an adequate remedy at law, such as damages for breach of contract or other tort remedies. *Harris Group,* 209 P.3d at 1205. The court has recommended herein that default judgment enter several of Plaintiff's claims, but particularly on Claim I, where the legal remedy is for the value of the Project Data, $11 million. Since the court has recommended that the Plaintiff receive the value of the Project Data as its legal remedy, the unjust enrichment claim may not proceed. The court recommends that default judgment be denied on Claim VIII.

### Claim IX        Conversion

Conversion is "any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Glenn Arms Associates v. Century Mortg. & Inv. Corp.,* 680 P.2d 1315, 1317 (Colo. App. 1984). A successful claim for conversion also requires that the owner demanded return of the property, and the controlling party refused. *Id.* "A 'conversion' is defined to be any act of the defendant inconsistent with the plaintiff's right of possession, or subversive of his right of property." *Keith v. Kinney,* 140 P.3d 141, 158 (Colo. App. 2005) (quoting *Omaha & Grant Smelting & Refining Co. v. Tabor,* 21 P. 925, 930 (Colo. 1889)); *see also Byron v. York Inv. Co.*, 296 P.2d 742, 745 (Colo. 1956) (common-law

conversion is "any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another.").

Conversion "is distinct from the crime of theft in that it does not require that a wrongdoer act with the specific intent to permanently deprive the owner of his property." *Itin v. Ungar,* 17 P.3d 129, 135 n. 10 (Colo. 2000).

Bolsa had acquired and developed a body of data and geologic material related to the Hill Copper Project, including core samples, assays, drill logs, analytical results, cross-section maps, ore body assessments and other geologic information. [Am. Compl. ¶28]. Plaintiff alleges that Project Data and Historic Data and information concerning drilling during 2005-2010, including the Hill Copper Project, was stored on the computer of Mr. Doppler while he was employed by Bolsa. (Prop. Rec. ¶¶ 36-39 and accompanying documents.) Bolsa alleges that the Defendants converted the Project Data and other materials and have refused to return them.

First, Plaintiff has shown that the Doppler Defendants exercised dominion or control over Plaintiff's Project Data by providing it to third parties, including Alpaca. (*See* Am. Compl. ¶ 136; Prop. Rec. Ex. J and K; Prop. Rec., Ex. A, Vol. I at 212/2-8, 214/14-20, Vol. II at 333/16-334/23; Ex. L; Ex. M, Transcript of Deposition of Yannis Banks, Vol. II at 232/22-233/4, 243/12-25). Plaintiff asserts that neither it nor its parent company, MMO, authorized such action by the Doppler Defendants. (*See* Am. Compl. ¶ 67.)

Plaintiff demanded return of the Project Data. (*Id.* ¶ 137; Prop. Rec., Ex. T.) Notwithstanding this demand, the Doppler Defendants failed to return any of the Project Data in their possession. *Id.* As a result, Plaintiff has provided evidentiary support for its claim for conversion.

The measure of damages for conversion "is the value of the converted property at the time and place of the misappropriation plus legal interest from the time of the conversion to the time of trial." *Masterson v. McCroskie,* 573 P.2d 547, 551 (Colo. 1978) (citing *Gates Factory Store v. Coleman*, 350 P.2d 559 (Colo. 1960)).

The most accurate estimation of the value of the converted property, the Project Data, is $11 million as set forth in the Appraisal.  Because the conversion by the Doppler Defendants stretched over a period of time, this Court will use the *effective* date of the Appraisal, March 27, 2012, as the date of the conversion for purposes of determining interest.  Interest can be calculated by using the legal rate for the time period in which it accrued.

Therefore, this court recommends that default judgment enter on Claim IX and that interest be calculated and awarded on the $11 million value of the Project Data..

### Claim X          Recovery of Stolen Property

Under Colo. Rev. Stat. § 18-4-401(1), "a person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and:

> (a) Intends to deprive the other person permanently of the use or benefit of the thing of value; or
>
> (b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit; or
>
> (c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use and benefit; . . .

As outlined *infra*, this court finds that the Doppler Defendants exercised control over Plaintiff's property, including the Project Data, without Plaintiff's authorization since they were

able to transfer the assets to Alpaca.  Further, as noted in the discussion of Claim IX, the taking of the Project Data was not authorized by the plaintiff.

Although Plaintiff also, at times, was able to access portions of the Project Data controlled by the Doppler Defendants, Bolsa no longer retained exclusive possession.  The Doppler Defendants' exclusive possession of the property allegedly stolen from Plaintiff is not a necessary element of theft.  *See People v. Maes,* 607 P.2d 1028, 1030 (Colo. App. 1979) (holding that "possession [by the thief] need not be sole to constitute requisite control over the stolen goods"); *People v. Gracey,* 940 P.2d 1050 (Colo. App. 1996) (holding that a defendant committed theft when he exercised control over another's property without authorization); *In re Tague,* 137 B.R. 495 (D. Colo. 1991) (holding that conversion is held sufficient for purposes of theft prosecution).

The Doppler Defendants received Plaintiff's property—specifically, the Project Data stored on the personal computers of Mr. Detra and Mr. Doppler and the boxes of Project Data stored at the Elfrida Property and Colorado property—with the belief that such property belonged rightfully to Plaintiff.  (Prop. Rec., Ex. A.1 at 32/1-6; Ex. E at 2.)  As demonstrated by the Doppler Defendants' unresponsiveness to Plaintiff's requests to return Project Data and their decision to alert Alpaca of Plaintiff's efforts to retrieve its Project Data, the Doppler Defendants demonstrated the intention to permanently deprive Plaintiff of exclusive use of its property. (Prop. Rec., Ex. T.)

Colo. Rev. Stat. § 18-4-405 provides:

> All property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property. The owner may

24

> maintain an action not only against the taker thereof but also against any person in whose possession he finds the property. In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater, and may also recover costs of the action and reasonable attorney fees . . . .

Consequently, having found that Plaintiff has come forward with evidence supporting the entry of default judgment on Claim X, recovery of stolen property, Plaintiff is entitled to recover three times the amount of actual damages plus its reasonable attorneys' fees and costs. The value of the stolen property—the Project Data—has been determined to be $11 million pursuant to the Appraisal. Thus, Plaintiff is entitled to judgment against the Doppler Defendants for $33 million plus reasonable attorney fees to be determined by the court and costs of litigation.

### Claim XI        Theft/Destruction of Trade Secrets

Under the Colorado Uniform Trade Secrets Act ("CUTA"), Plaintiff may recover damages for misappropriation of its trade secrets. Colo. Rev. Stat. § 7-74-101 *et seq*. Pursuant to Colo. Rev. Stat. § 7-74-102(4)

> (4) "Trade secret" means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

The fact that a trade secret holds value, and the amount thereof, can be shown by reference to: (a) the costs of the information; (b) the competitive advantage afforded the owner of the trade secret; or (c) the amount of time and money invested in the development of the trade secret. *See Gold Messenger, Inc. v. Mguay*, 937 P.2d 907, 911 (Colo. App. 1997) (holding that trade secret had

value because it provided an advantage over other competitors); *Harvey Barnett, Inc. v. Shidler,*

338 F.3d 1125, 1130 (10th Cir. 2003).

CUTA defines "misappropriation" as:

> (a) Acquisition of a trade secret of another by a person who knows or has
>     reason to know that the trade secret was acquired by improper means;
>     or
> (b) Disclosure or use of a trade secret of another without express or
>     implied consent by a person who:
>     (I)  Used improper means to acquire knowledge of the trade secret; or
>     (II) At the time of disclosure or use, knew or had reason to know that
>          such person's knowledge of the trade secret was:
>          (A) Derived from or through a person who had utilized improper
>              means to acquire it;
>          (B) Acquired under circumstances giving rise to a duty to maintain
>              its secrecy or limit its use; or
>          (C) Derived from or through a person who owed a duty to the
>              person seeking relief to maintain its secrecy or limit its use; or
>     (III) Before a material change of such person's position, knew or had
>           reason to know that it was a trade secret and that knowledge of it
>           had been acquired by accident or mistake.

Colo. Rev. Stat. § 7-74-102(2). Acquisition by "improper means" includes theft and

misrepresentation. Colo. Rev. Stat. § 7-74-102(1).

Colorado courts have defined a trade secret "broadly to include all or part of virtually any

information that is of value, whether it be in the nature of scientific, technical, business,

financial, or professional information, as long as the owner has taken measures to prevent it from

becoming available beyond those to whom he has given limited access." *Gognat v. Ellsworth*,

259 P.3d 497, 501 (Colo. 2011). Plaintiff's Project Data falls well within this categorization.

The Project Data consists of information, both geologic and financial, relating to the exploration,

development and value of the Hill Copper Project. (Am. Compl. ¶ 28, Project Data is "a body of

26

data and geologic material related to the Project, including core samples, assays, drill logs,

analytical results, cross-section maps, ore body assessments and other geologic information.").

*See, e.g., Amoco Production Co. v. Laird,* 622 N.E.2d 912 (Ind. 1993) (holding that information

regarding the location of potential oil fields is a trade secret); *Hunter v. Shell Oil Co.,* 198 F.2d

485 (5th Cir. 1952) (holding that information regarding a company's intended location for a

plant site was a trade secret).  Plaintiff maintains that the Project Data is valuable, stating,

"without the Project Data, the owner of the Project Assets would have no idea where to begin

exploration and development and could not raise financing for the Project."  (Prop. Rec. ¶ 87.)

 By including confidentiality provisions in its consulting agreements and in agreements

with third parties, Plaintiff demonstrated a concerted effort to protect the confidentiality of the

Project Data.[5]  *Kodekey Electronics, Inc. v. Mechanex Corp.,* 486 F.2d 449 (10th Cir. 1973)

(holding that an employee's agreement not to disclose his employer's confidential information is

"a positive acknowledgement" that the information is confidential and secret); *Colorado Supply*

*Co. v. Stewart,* 797 P.2d 1306 (Colo. App. 1991); *In Re S & D Foods, Inc.,* 144 B.R. 121, 168

(Bkrtcy. D. Colo. 1992) (holding that "an agreement not to disclose confidential information is

an acknowledgement that the information is a trade secret").

---

[5] Some of the Project Data was stored electronically and may have been available to third parties without execution of a confidentiality agreement.  This does not prevent the collection of data designated 'Project Data' from qualifying as a trade secret.  *Rivendell Forest Products, Ltd. v. Georgia-Pacific Corp.,* 28 F.3d 1042, 1046 (10th Cir. 1994) (holding that a "trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation"); *Haggard v. Spine,* Case No. 09-cv-00721-CMA-KMT, 2009 WL 1655030, at *7 (D. Colo. June 12, 2009).

As demonstrated by the Appraisal, the Project Data has a current value of $11 million. Therefore, the Project Data satisfy the criteria to be held as a trade secret.

As more specifically set forth in the evidence supporting earlier claims in this Recommendation, there is ample evidence of the Doppler Defendant's misappropriation of the Project Data.  In addition to improperly acquiring Plaintiff's trade secrets, the Doppler Defendants did not return the Project Data to Bolsa upon ending their contractual relations with Plaintiff as required by the Agreement.  (Am. Compl., ¶¶ 21, 137.)  After omitting to return the Project Data, the Doppler Defendants actively refused to return any Project Data in their possession when Plaintiff requested.  (*See* Prop. Rec., Ex. A.1 at 26:25-28:25, Ex. A.2 at 1:18-4:7, 5:4-7:4, 61:15-63:15; Ex. E; Ex. T.)  Then, breaching the confidentiality provision of its Agreement with Plaintiff, the Doppler Defendants shared the Project Data with Alpaca. Additionally, it is alleged that on either June 29 or 30, 2010, a break-in occurred into Plaintiff's Colorado office and approximately 200 files of drilling data relating to the Hill Copper Project were stolen.  (*See* Prop. Rec., Ex. Q.)  On June 30, 2010, Mr. Doppler wrote an email to Alpaca as a bid to do work for them, Doppler said the data he was going to use on the Alpaca project included "the data on the DVDs that was pulled off of the Bolsa server, plus everything that Earl & I had on our laptops." (Prop. Rec., Ex. E at 2.)  Additionally, Doppler added, "the remainder of the Hill project data which has recently been made accessible/available to us (don't ask) that includes just about all of the . . . ." *(Id.)*

As a result, this court finds that there is ample evidence supporting that the Doppler Defendants misappropriated Bolsa's trade secrets - the Project Data – and gave them to Bolsa's competitor, Alpaca, in order to accrue personal financial gain.

Damages for misappropriation of trade secrets "may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Colo. Rev. Stat. § 7-74-104(1).  The appropriate measure of damages in this case is the value of the Project Data, which has been determined to be $11 million.  (*See* Prop. Rec., Ex. G.1 and G.2.)  Furthermore, if willful and malicious misappropriation exists, the court may award reasonable attorney fees.  Colo. Rev. Stat. § 7-74-105.  The evidence in this case, including the Doppler Defendants' refusal to return Project Data upon Plaintiff's request (Prop. Rec., Ex. T) and the Doppler Defendants' recommendation that Alpaca stake mining claims to "add to Bolsa's woes" (*See* Prop. Rec., Ex. A.2. at 516/7-25), in addition to the outright theft of some of the data as noted in Doppler's June 30, 2010 memo, supports a finding that the Doppler Defendants' actions were "willful and malicious."

The court concludes that the Plaintiff has presented well-pleaded facts which support each element of the claim of misappropriation of trade secrets and that default judgment in the amount of $11 million actual loss on the claim is appropriate.  Further, the well-pleaded facts also support that the Doppler Defendants' actions were willful and malicious and that attorney fees should be awarded in an amount to be  determined by the court along with the costs of litigation.

### Claim XII      Conspiracy

In Colorado, in order for there to have been a conspiracy, there must be: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and

(5) damages as the proximate result thereof.  *Jet Courier Service, Inc. v. Mulei,* 771 P.2d 486

(Colo. 1989) (citing *More v. Johnson,* 193 Colo. 489, 493 (1977)).

Plaintiff asserts that the Doppler Defendants conspired with other Defendants, including

Alpaca, Alpaca executives, Alpaca subsidiaries, Mr. Warnaars, and Mr. Johnson, in order to

accomplish the objective of depriving Plaintiff of its property, including the Project Assets and

Project Data, for their own benefit.  (*See* Am. Compl.)

Specially, however, the Plaintiff points to collusion between Warnaars and the Doppler

Defendants in support of its conspiracy claim.  Plaintiff has provided support for is allegations

that on February 15, 2010, Warnaars executed two quit claim deeds conveying two of the

Courtland Townsites, the Man Claims and Gold Coin No. 55, along with all Project Data, to

IAR, Warnaars' company. These deeds were recorded in the public records of Cochise County

on February 19, 2010 (Man Claims and Gold Coin No. 55) and March 26, 2010 (Courtland

Townsites).  (Am. Compl., Ex. E).  Also on February 15, 2010, Warnaars executed a quit claim

deed conveying the Newmont Claims to Defendant Johnson.  (*Id.*, Ex. C).  These deeds were

signed by Warnaars as President of Bolsa.  (*Id.*, Ex. E].   At the time these deeds were executed

and recorded, the Doppler Defendants were aware both that Warnaars was not President of

Bolsa, and that Warnaars had not obtained approval from Bolsa's sole director – Mr. Frank

Vermeulen – for these transfers.  (Am. Compl., ¶¶41, 64, 66 and 67; Prop. Rec., Ex. A.1 at

69:15-71:14).

Plaintiff further  alleges that at the time Mr. Doppler and Mr. Warnaars created MRI as a

joint venture to market Plaintiff's Project Assets, both men were aware of Mr. Warnaars'

purported transfer of Project Assets to Alpaca on February 15, 2010.  (Am. Compl., Ex. C.)

In furtherance of this conspiracy, the Doppler Defendants engaged in more than one unlawful act, including conversion and theft of Plaintiff's property and misappropriation of its trade secrets as set forth more fully in the supporting evidence section of Claims IX, X and XI. As a result of these actions, Plaintiff was damaged.  Consequently, this court finds that under the facts of this case, the Doppler Defendants were a part of a conspiracy to deprive Plaintiff of the Project Assets and Project Data and therefore default judgment in favor of Plaintiff should be entered on this claim in the amount of the value of the Project Data, $11 million according to the Appraisal.

### Claim XIII    Violations of the Colorado Organized Crime Control Act

The Colorado Organized Crime Control Act (COCCA) provides for the liability of any person associated with an enterprise which affects interstate commerce to conduct or participate in the affairs of such enterprise through a pattern of racketeering activity. Colo. Rev. Stat. § 18-17-101 *et seq.*

COCCA defines an "enterprise" as

any individual, sole proprietorship, partnership, corporation, trust, or other legal entity or any chartered union, association, or group of individuals, associated in fact although not a legal entity, and shall include illicit as well as licit enterprises and governmental as well as other entities.

Colo. Rev. Stat. § 18-17-103(2).  Further COCCA provides

(5) "Racketeering activity" means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit:

(a) Any conduct defined as "racketeering activity" under 18 U.S.C. 1961(1)(A), (1)(B), (1)(C), and (1)(D); or

(b) Any violation of the following provisions of the Colorado statutes or any criminal act committed in any jurisdiction of the United States

> which, if committed in this state, would be a crime under the following
> provisions of the Colorado statutes:
> (I)   Offenses against property, as defined in . . . section 18-4-401
>        (theft) . . . 18-4-410 (theft by receiving);
> (IV) Offenses involving fraud, 18-5-114 (offering a false document for
>        recording) . . . .

A "pattern of racketeering activity" means engaging in at least two acts of racketeering activity related to the conduct of the enterprise.  Colo. Rev. Stat. § 18-17-103(3).

Salzburg Holdings, LLC, a Colorado limited liability company, is obviously the enterprise utilized by the Doppler Defendants to engage in the alleged racketeering activity. There is no allegation in the Amended Complaint that Salzburg Holdings – or any other entity charged as a Defendant in this case – was an entity which affected interstate commerce.  Each of the elements of a COCCA claim must be pled with particularity.  *Brooks v. Bank of Boulder,* 911 F. Supp. 470, 473 (D. Colo. 1996).

The Amended Complaint lists AARC, SOGC and JNS as the defendants which were "formed for the sole purpose of taking title to certain Project Assets in furtherance of the Enterprise."  (Am. Compl. ¶ 160.)  AARC is not mentioned at all in Plaintiff's Proposed Recommendations and SOGC and JNS are each mentioned only in footnote 7 as Alpaca-related entities.  However, there is no allegation in the Amended Complaint that any of those three entities affected interstate commerce either.

This court finds that the Plaintiff has failed to plead or to prove that the Doppler Defendants utilized an enterprise which affected interstate commerce, an essential element of a COCCA claim.  Therefore, it is recommended that default judgment not be entered on this Claim.

### C.      The Doppler Defendants' Counterclaim

In their counterclaim, the Doppler Defendants seek damages of $7,710 that Plaintiff allegedly owed to them.  However, in light of the Doppler Defendants' default in this action, this court recommends that the Doppler Defendants' counterclaim be dismissed with prejudice for failure to prosecute.  *U.S. ex rel. Jimenez v. Health Net, Inc.*, 400 F.3d 853, 855 (10th Cir. 2005) (courts may dismiss claims *sua sponte* for lack of prosecution in order to achieve expeditious and orderly disposition of cases).

## VI.    DAMAGES AND ATTORNEYS' FEES

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides:

> If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary.

Fed. R. Civ. P. 55(b)(2).  The burden is on the plaintiff to establish entitlement to recovery of damages against a defaulting defendant.  *United States v. Fehrenbacher*, Civil Action No. 10-cv-01290-WYD-MEH, 2011 WL 3156948, at *8 (D. Colo. July 7, 2011) (citing *Cablevision of S. Conn., Ltd. P'ship v. Smith,* 141 F.Supp.2d 277, 282 (D. Conn. 2001).  "[A] court may enter a default judgment without a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation." *Hunt v. Inter–Globe Energy, Inc.,* 770 F.2d 145, 148 (10th Cir.1985)(citing *Venable v. Haislip,* 721 F.2d 297, 300 (10th Cir.1983).

Here the Market Value Appraisal of the Interests Held by Bolsa Resources in the Hill Copper Property, Turquoise Mining District, Arizona, prepared by Trevor R. Ellis, Certified

Professional Geologist, Certified Minerals Appraiser, Certified General Appraiser and Minerals Economist dated April 23, 2012 (Prop. Rec., Ex. G), a fifty-page valuation, provides a competent and complete evaluation of the Project Data which would not be enhanced by a hearing. Likewise, for Claim IX - Conversion, which allows for the collection of interest from March 27, 2012, this sum is a mathematical calculation of the legal rate of interest multiplied by $11 million, so therefore is a sum capable of easy computation.  Thus, this Court finds that a hearing on damages is not necessary in this case.[6]

However, as Claim X for Recovery of Stolen Property and Claim XI for Theft/Destruction of Trade Secrets, for which this court has also recommended that the Plaintiff be allowed the recovery of its reasonable attorney fees in connection with prosecuting the Claims, a hearing will be necessary.  "[A]ttorney's fees may not be awarded without a hearing to determine the amount." *Hunt v. Inter–Globe Energy, Inc.,* 770 F.2d at 148; *Applied Capital, Inc. v. Gibson*, 558 F. Supp. 2d 1189, 1202 (D.N.M. 2007).

Wherefore, it is **RECOMMENDED** as follows:

"Plaintiff, Bolsa Resources, Inc.'s Proposed Recommendations, Findings of Fact and Conclusions of Law Recommending Entry of Default Judgment Against Defendant Stephen B. Doppler and Salzburg Holdings, LLC".  (Doc. No. 310) be **GRANTED in part and DENIED in part** as follows:

---

[6] As noted *supra*, equitable remedies may not be used to fashion relief when there is a "plain, speedy, [and] adequate remedy at law." *Szaloczi v. John R. Behrmann Revocable Trust,* 90 P.3d 835, 842 (Colo. 2004); *Harris Group Inc.*, 209 P.3d at 1205.  Therefore, Claim XIV for injunctive relief should be dismissed.

34

1.      Default Judgment should be entered with respect to Claim I – breach of contract; Claim II – breach of the duty of good faith and fair dealing; Claim VI – tortious interference with business advantage; Claim XI – theft/destruction of trade secrets; and Claim XII – civil conspiracy in the damage amount of $11 million.

2.      Default Judgment should be entered with respect to Claim IX – conversion, as part of the total damage amount of  $11 million as associated with Claims I, II, IV, VI, XI and XII,  plus interest from March 27, 2012.

3.      Default Judgment should be entered with respect to Claim X – recovery of stolen property, in the triple damage amount of $33 million (of which the $11 million awarded with respect to damages on Claims I, II, IV, VI, IX, XI and XII would be a part).

4.      The request for default judgment should be DENIED with respect to Claim IV – nondisclosures; Claim V – tortious interference with contract; Claim VIII – unjust enrichment; Claim XIII – violations of the COCCA and Claim XIV – injunctive relief.

5.      The court should schedule and hold a hearing with respect to the amount of reasonable attorney's fees and costs of litigation which should be awarded with respect to entry of Default Judgment on Claims X and XI.

6.      The Counterclaim of Stephen B. Doppler and Salzburg Holdings, L.L.C. [Doc. No. 48] should be dismissed.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and

recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal

the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 28th day of August, 2014.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge